UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DETROIT DIESEL CORPORATION, a
Delaware corporation,

    Plaintiff,

v.

MARTINREA HONSEL MEXICO SA DE
CV, a foreign corporation,

    Defendant.

Case No. 2:24-cv-11557

Hon. Jonathan J.C. Grey
Mag. Kimberly G. Altman

# MARTINREA HONSEL MEXICO'S RESPONSE TO DDC'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Issue Presented ........................................................................................... iv

Controlling Authority ................................................................................... v

Persuasive Authority .................................................................................... v

Table of Authorities ..................................................................................... vi

Introduction ................................................................................................ 1

Facts ............................................................................................................ 5

1.    DDC and Martinrea Honsel Mexico contract for the sale of
      transmission housings. ...................................................................... 5

2.    DDC sues Martinrea Honsel Mexico and eventually serves it. ........ 8

3.    Martinea Honsel Mexico rejects all future releases from DDC because
      it does not wish to do business with a customer who is suing it. ....... 8

4.    Martinrea Honsel Mexico is willing to continue deliveries under a new
      contract with DDC. ........................................................................... 8

Legal Standard ............................................................................................ 9

Analysis ...................................................................................................... 10

1.    DDC is unlikely to succeed on the merits because Martinrea Honsel
      Mexico has no contractual duty to deliver parts. ........................... 10

      A.    The Michigan Supreme Court's opinion in *Airboss* clarified the
            law surrounding requirements contracts........................................ 10

      B.    The Michigan Supreme Court also formally recognized release-
            by-release contracts, which are enforceable only to the extent of
            the firm quantities stated on the last release accepted by the
            seller. ..................................................................................... 14

      C.    The contract here is either for one part or is a release-by-release
            contract; it is not a requirements contract. ........................... 15

      D.    That this is not a requirements contract is supported by DDC's
            course of performance. ......................................................... 16

E.     This Court should reject DDC's argument to apply the Michigan Court of Appeals' *Cadillac Rubber* opinion because it conflicts with the Michigan Supreme Court's later decision in *Airboss*..................................................................................... 17

2.    In *Ultra Mfg.*, Judge Steeh adopted the analysis above, followed *Airboss* over *Cadillac Rubber*, and denied a substantially identical motion. ...............20

3.    DDC's arguments to the contrary should be rejected. .................................22

A.     DDC's reliance on *Dieomatic* is misplaced. .......................................22

B.     A contract that measures the quantity by the buyer's discretion is not enforceable as a requirements contract. ...................................22

Conclusion and Relief Requested ........................................................................ 23

## ISSUE PRESENTED

A preliminary injunction should not issue when the movant isn't likely to succeed on the merits. DDC's motion depends on Martinrea Honsel Mexico having an ongoing contractual obligation to deliver all the parts DDC orders. But DDC's contract states that it is for "1 part to 100% of DDC's needs," and one court in this District has already held in a published decision that such a contract is not a requirements contract. This means that the seller can exit the contract, ending any obligations to deliver. Martinrea Honsel Mexico has done just that. Should this Court thus deny DDC's motion because it has no likelihood of success on the merits?

## CONTROLLING AUTHORITY

- *MSSC, Inc. v. Airboss Flexible Prod. Co.*, 511 Mich. 176 (2023), as amended by order (Sept. 22, 2023) – *Airboss* holds that a contract for the sale of goods is not enforceable as a requirements contract unless it states precisely the set share of the buyer's requirements that the buyer must buy and the seller must deliver.

- M.C.L. § 440.2201(1) – Uniform Commercial Code § 2-201(1), the statute of frauds, states that a contract for the sale of goods "is not enforceable under this subsection beyond the quantity of goods shown in the writing."

- M.C.L. § 440.2306(1) – UCC § 2-306 allows for contracts to state the quantity term as measured by the buyer's requirements.

## PERSUASIVE AUTHORITY

- *Ultra Mfg. (U.S.A.) Inc. v. ER Wagner Mfg. Co.*, 713 F. Supp. 3d 394 (E.D. Mich. 2024) (Steeh, J.) – *Ultra Mfg.* is on all fours with this case. Judge Steeh denied a buyer's motion for preliminary injunction against an automotive supplier because a contract very much like this one was not a requirements contract, so the buyer was unlikely to succeed on the merits of its claim.

# TABLE OF AUTHORITIES

## Cases

*Acemco, Inc. v. Olympic Steel Lafayette, Inc.*,
   2005 WL 2820716 (Mich. App.) ................................................17, 18

*ACLU of Ky. v. McCreary County, Ky.*,
   354 F.3d 438 (6th Cir. 2003) ...................................................... 9

*Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*,
   331 Mich. App. 416 (2020) ................................................passim

*CLT Logistics v. River W. Brands*,
   777 F. Supp. 2d 1052 (E.D. Mich. 2011) ................................ 9

*Gonzales v. Nat'l Bd. of Med. Exam'rs*,
   225 F.3d 620 (6th Cir. 2000) ........................................9, 10, 19

*Higuchi Int'l Corp. v. Autoliv ASP, Inc.*,
   103 F.4th 400 (6th Cir. 2024) ................................................ 12, 23

*In re Flint Water Cases*,
   584 F.Supp.3d 383 (E.D. Mich. 2022) .................................. 19

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*,
   475 F.3d 783 (6th Cir. 2007) ................................................ 19, 21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................... 9

## Statutes

M.C.L. § 440.2201...................................................................v, 11

M.C.L. § 440.2306 ...........................................................passim

## Other Authorities

*Black's Law Dictionary* (11th ed.)............................................12

*Oxford Dictionary of English* (2024) (app version) ....................23

**Rules**

Fed. R. Civ. P. 65 ...................................................................................... 9

## INTRODUCTION

DDC's motion for a preliminary injunction is essentially identical to that at issue in *Ultra Mfg. (U.S.A.) Inc. v. ER Wagner Mfg. Co.*, 713 F. Supp. 3d 394 (E.D. Mich. 2024) (Steeh, J.). That case, like this one, arose in the automotive supply chain after a seller rejected the buyer's releases and asserted that its contractual obligation to deliver parts to the buyer had ended. And in that case, like in this one, the buyer insisted that the parties had an enforceable requirements contract under the Michigan Court of Appeals' decision in *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 331 Mich. App. 416 (2020) . The relevant contract terms are even substantially the same—the contract in *Ultra Mfg.* was for "some portion or all of [the buyer's] requirements," 713 F. Supp. 3d at 395, while the contract here is for "1 part to 100% of DDC's needs."

In *Ultra Mfg.*, Judge George Caram Steeh denied the buyer's motion for a preliminary injunction because "the parties' agreement [was] not a requirements contract," so the seller was "free to allow its obligations to expire by not accepting further releases." 713 F. Supp. 3d at 398.

This, Judge Steeh held, is because *Cadillac Rubber*—the case that DDC so heavily relies on here—irreconcilably conflicts with the Michigan Supreme Court's more recent decision in *MSSC, Inc. v. Airboss Flexible Prod. Co.*, 511 Mich. 176 (2023), as amended by order (Sept. 22, 2023). *Cadillac Rubber* held that a contract for "1 part to 100% of the buyer's requirements" is an enforceable requirements contract. But *Airboss* later held that a contract for the sale of goods is enforceable as a requirements contract only if it precisely states the set share of the buyer's

requirements that the buyer must buy and the seller must deliver. Judge Steeh concluded that these holdings conflict and that he should follow *Airboss*. He thus held that a quantity term for "some portion or all of [the buyer's] requirements" is too vague to create an enforceable requirements contract under Michigan law, concluding:

> In other words, [the seller] is not required to continue to supply parts at the original contract price and it is not in breach of the parties' agreement. Therefore, [the buyer] is not likely to succeed on the merits of its contract claim, which is fatal to a request for injunctive relief.

*Id.* The same reasoning applies here, so the same result should follow.

♦   ♦   ♦

In its motion, DDC asks this Court to impose a preliminary injunction compelling Martinrea Honsel Mexico to continue to deliver automotive parts—specifically, transmission housings—to DDC. To succeed, DDC must show that it is likely to succeed on its claim that Martinrea Honsel Mexico has an ongoing contractual duty to deliver parts to DDC, and that Martinrea Honsel Mexico would breach that duty by stopping deliveries. DDC can't make that showing because the contract it wrote doesn't contain the necessary duty. This is because this is not a requirements contract.

Contracts for the sale of goods, like that here, are governed by the Uniform Commercial Code. Under the UCC, a contract is enforceable for only the quantity term stated in the contract, and if there is no stated quantity term, it isn't enforceable at all. Quantity is thus the only essential term in such a contract.

— 2 —

The UCC explicitly allows parties to state the quantity term as measured by the buyer's requirements, and such a *requirements contract* is enforceable for the precise set share of the buyer's needs stated in the contract. In the automotive supply chain, most such contracts are for 100% of the buyer's requirements for the life of the vehicle program into which the goods are incorporated, but contracts for "one third of buyer's requirements" or "70% of buyer's needs" are equally enforceable (but only for the stated share). Buyers typically communicate the specific quantities that they need on specific dates in regularly issued documents called releases. Unless the seller has the right to terminate the contract or its performance is excused for some other reason, a requirements contract is usually enforceable for the stated duration (often, the life of applicable vehicle program).

There is another contract structure that looks much like a requirements contract but isn't enforceable in the same way. A *release-by-release contract* is a contract with an umbrella set of terms and under which the buyer does not commit to a precise set share of its requirements but communicates the specific quantities it needs on specific days using releases. In this structure, the contract lacks a quantity term unless and until specific firm quantities are stated in an issued and accepted release. In other words, neither the terms nor any purchase order or other agreement says that the buyer must buy and the seller must deliver any precise set share of the buyer's requirements or any fixed quantity. Because contracts for the sale of goods are not enforceable without a quantity term, these contracts aren't enforceable until the buyer issues and the seller accepts a release. That acceptance forms a fixed-quantity contract that is enforceable for the fixed, firm quantities stated on the

release but no others. This contract structure is called a release-by-release contract because it is a series of fixed-quantity contracts formed one release at a time.

Release-by-release contracts grant significant flexibility to the parties. Because they are enforceable only one release at time, the buyer, when it needs parts, can issue the release to any supplier it chooses. And most relevant here, the seller may reject any release it is offered. A seller who has rejected all future releases must still deliver the firm quantities on any releases it did accept, but once those deliveries are made, its contractual duty to deliver parts to the buyer expires.

That is what has happened here. The parties have a release-by-release contract under which each release issued by DDC states firm quantities for the next four weeks. Martinrea Honsel Mexico accepted each offered release until February 10, 2025, when it notified DDC that it would not accept any future releases. As a result, Martinrea Honsel Mexico's contractual duty to deliver parts to DDC ended on March 7, 2025.[1]

DDC insists that this is a requirements contract because the contract states that it is for "a quantity between a single good and 100% of DDC's needs from external sources for the goods." 2024 Terms § 1, ECF No. 14-4, PageID.902. (A different contract document says essentially the same thing: "DDC agrees to purchase from Supplier 1 part to 100% of DDC's needs for the parts (series parts and after sales parts) from external sources." 2024 Amendment § 1.1, ECF No. 14-4, PageID.898.)

---

[1] Martinrea Honsel Mexico continues deliveries after this date only because it is subject to a temporary restraining order. It stipulated to that TRO only so that it could make its case on the merits at the preliminary-injunction stage.

But a contract with a purported quantity term of between one part and 100% of the buyer's requirements is not a requirements contract because the buyer's obligation to buy and the seller's obligation to deliver is not measured by the buyer's needs, as mandated by the UCC. Instead, a buyer who needs 1,000 parts can satisfy that asserted contract term by buying only a single part or any number up to 1,000, at its discretion. So the buyer's obligation to buy is measured by its whim, not its requirements.

This interpretation is bolstered by DDC's conduct here. It admits that it has a secondary source for the parts from whom it obtains between 25% and 40% of its needs. Browning Affidavit ¶¶ 8 & 12, ECF No. 14-3, PageID.878 & 880. DDC exercises its whim to buy what it wants from whichever supplier it chooses.

Because this is a release-by-release contract, Martinrea Honsel Mexico has the discretion to stop accepting releases. It did so, and as a result, its duty to deliver parts to DDC expired on March 7. In other words, after March 7, there is no contract between the parties.

Without an ongoing contract, DDC cannot succeed on the merits of its claim. That dooms DDC's motion for a preliminary injunction.

## FACTS

### 1.    DDC and Martinrea Honsel Mexico contract for the sale of transmission housings.

The relevant contract history begins in 2013, when the parties formed a long-term agreement (LTA). Ex. 1, Lancaster Declaration ¶ 3; 2013 LTA, ECF No. 14-4,

PageID.886–895. That LTA did not contain a quantity term, but merely provided that "DDC agrees to purchase from Supplier the Parts as ordered from time to time by DDC." 2013 LTA § 1.1, ECF No. 14-4, PageID.886. The 2011 version of DDC's purchase order terms and conditions, which are part of the 2013 LTA, similarly lack a quantity term. 2013 LTA, ECF No. 14-4, PageID.890–894. The parties formed an addendum to the LTA in 2020. Ex. 1 ¶ 3; 2020 Addendum, ECF No. 14-4, PageID.896–897. This addendum extended the contract but did not add a quantity term.

Then, in 2024, the parties formed an amended and restated long term agreement. Ex. 1 ¶ 3; 2024 Amendment, ECF No. 14-4, PageID.898–909. This amendment extended the contract yet again and, for the first time, purported to address how many parts DDC must buy and Martinrea Honsel Mexico must deliver. The amendment states:

> During the term of this Agreement, Supplier agrees to sell to DDC and DDC agrees to purchase from Supplier *1 part to 100% of DDC's needs* for the parts (series parts and after sales parts) from external sources as more particularly described in Annex 1 attached hereto and by this reference incorporated herein (the "Parts"). DDC's needs shall be further defined through orders or releases submitted from time to time by DDC and Supplier shall fulfill all such orders.

2024 Amendment § 1.1, ECF No. 14-4, PageID.898.[2] The incorporated 2024 version of DDC's terms say substantially the same thing:

> Seller agrees to sell to DDC and DDC agrees to purchase from Seller *a quantity between a single good and 100% of DDC's needs for the goods*.

---

[2] Emphasis is added throughout unless otherwise stated.

> DDC's needs shall be further defined through orders or releases
> submitted from time to time by DDC, or as specifically set forth on the
> face of this purchase order, and Seller shall fulfill all such orders.

2024 Terms § 1, ECF No. 14-4, PageID.902.

Since January 1, 2024, the parties have been operating under the LTA, as amended in 2020 and 2024. Ex. 1 ¶ 4. Under that contract, DDC communicates the specific quantities that it needs on specific dates through weekly releases. Ex. 1 ¶ 4. Each release shows quantities going out for many weeks, but under the "Doing Business with Detroit Diesel Corporation" guide incorporated into the LTA, only those quantities shown for the first eight weeks are firm: "Quantities in the first eight weeks are for fabrication. All quantities shown after the first eight weeks are for planning purposes only." DDC Guide § 2.3.2, ECF No. 133, PageID.768. In practice, though, the parties have reduced the firm period even further. Ex. 1 ¶ 4.

DDC has routinely told Martinrea Honsel Mexico to ship to an emailed release schedule and to not follow the EDI (the electronic data interchange, which many in the supply chain use to communicate releases). Ex. 1 ¶ 5; Ex. 2, January 30, 2025 Email Chain; Ex. 3, February 6, 2025 Email Chain. These emailed releases purported to be firm for only four weeks, with DDC often changing specific quantities that were more than four weeks out. Ex. 1 ¶ 5; Ex. 2; Ex. 3. In fact, DDC sometimes changed specific quantities even within that four-week "firm" window. Ex. 1 ¶ 5.

**2.  DDC sues Martinrea Honsel Mexico and eventually serves it.**

In June 2024, DDC filed this action against Martinrea Honsel Mexico. ECF No. 1, PageID.1–6. In its first amended complaint, DDC alleges that Martinrea Honsel Mexico began to fall behind in its delivery obligations in 2020, breaching the LTA. First Amended Complaint ¶ 14, ECF No. 13, PageID.707. DDC alleges that this caused it to suffer more than $18 million in damages. First Amended Complaint ¶ 19, ECF No. 13, PageID.708. DDC served Martinrea Honsel Mexico with the summons and original complaint on February 6, 2025. Ex. 1 ¶ 6.

**3.  Martinea Honsel Mexico rejects all future releases from DDC because it does not wish to do business with a customer who is suing it.**

A few days later, Martinrea Honsel Mexico informed DDC that it was rejecting all future releases, that it would fulfill the four weeks of firm quantities on the last accepted release but no more, and that its contractual obligations to delivery parts to DDC would thus expire on March 7, 2025. Letter, ECF No. 14-2, PageID.873–874. Martinrea Honsel Mexico has explained to DDC that it does not wish to do business with a customer that is suing it. Ex. 1 ¶ 7.

**4.  Martinrea Honsel Mexico is willing to continue deliveries under a new contract with DDC.**

Martinrea Honsel Mexico has also explained that it is willing to enter into a new agreement to continue deliveries to DDC, but only on terms that include DDC's full release of all claims that were or could have been asserted in this action. Ex. 1 ¶ 7. This means that the parade of horribles in DDC's motion—the shutdowns, the layoffs, the hundreds of millions of dollars in lost sales—will come to pass only if

DDC allows them to. This is because even without the injunction that DDC seeks, Martinrea Honsel Mexico is willing to negotiate an agreement to keep parts flowing and the supply chain operating. Ex. 1 ¶ 7.

And even if DDC chooses not to enter into a new contract with Martinrea Honsel Mexico, the supply chain won't shut down. As DDC admits, it has a secondary source from whom it obtains up to 40% of its needs. Browning Affidavit ¶¶ 8 & 12, ECF No. 14-3, PageID.878 & 880. So even if all that DDC says is true, and that its secondary source cannot supply more than 40% of DDC's requirements, this will at most slow but not stop the supply chain.

## LEGAL STANDARD

DDC has now moved this Court for a preliminary injunction under Fed. R. Civ. P. 65(a). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir. 2003), *and CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011).

"Although the factors are to be balanced, a finding that there is no likelihood of irreparable harm or no likelihood of success on the merits is usually fatal." *Ultra Mfg.*, 713 F. Supp. 3d at 396 (citing *CLT Logistics*, 777 F. Supp. 2d at 1064, in turn citing *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)).

DDC cannot meet its burden here because it cannot show that it is likely to succeed on the merits of its claim that Martinrea Honsel Mexico will breach the contract if it stops deliveries. So this Court should deny DDC's motion.

## ANALYSIS

### 1.  DDC is unlikely to succeed on the merits because Martinrea Honsel Mexico has no contractual duty to deliver parts.

DDC's motion rests on its assertion that there is an enforceable requirements contract between the parties. DDC's Brief, ECF No. 14, PageID.862–864. Even though the contract references DDC's requirements, a close examination of the contract text reveals that the number of parts that DDC must buy is *not* measured by its needs, as mandated by Michigan law. *Airboss*, 511 Mich. at 183; M.C.L. § 440.2306(1). This is thus not a requirements contract, Martinrea Honsel Mexico has properly rejected releases, and the contract has expired. DDC is therefore unlikely to succeed on the merits, which is "fatal" to its motion. *Gonzales*, 225 F.3d at 625; *Ultra Mfg.*, 713 F. Supp. 3d at 396. (The *Ultra Mfg.* decision, which denied to enter a preliminary injunction based on a contract effectively the same as that here, is detailed in Argument § 2, below.)

### A.  The Michigan Supreme Court's opinion in *Airboss* clarified the law surrounding requirements contracts.

The Michigan Supreme Court's opinion in *Airboss*, is a master class on requirements contracts. As the Court explained, the analysis of whether a contract is a requirements contract and the extent of its enforceability begins with the Uniform Commercial Code's statute of frauds (§ 2-201). *Airboss*, 511 Mich. at 180–

— 10 —

82; M.C.L. § 440.2201. The second sentence of § 2-201(1) provides: "A writing is not insufficient because it omits or incorrectly states a term agreed upon *but the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.*" § 440.2201(1).[3] This "provides that a court can only enforce the contract up to the quantity set forth in writing." *Airboss*, 511 Mich. at 181.

Quantity is thus "the only essential term" needed to form a contract for the sale of goods. *Id.* When a contract states an enforceable quantity term "but fails to express details sufficient to determine the specific or total quantity," the quantity term may be clarified with parol evidence.[4] *Id.* But when a contract fails to state an enforceable quantity term, parol evidence cannot fill the gap; the contract is unenforceable. *Id.*; § 440.2201(1).

When a contract states that it covers a fixed number of parts—"125 widgets"— the scope of the contract is clear. But the UCC envisions two other types of quantity terms that "lack specificity as to the total of goods agreed upon." *Airboss*, 511 Mich. at 182. For the type relevant here—*requirements contracts*—§ 2-306(1) of the UCC "allows for a contract's quantity to be measured 'by . . . the requirements of the buyer . . . .'" *Id.*, quoting § 440.2306(1). A requirements contract is thus "[a]

---

[3] Emphasis is added unless otherwise indicated.

[4] As will be explained in more detail below, this might happen when a contract is for 100% of the buyer's requirements. Such a contract, without more information, doesn't tell the seller how many goods—the specific or total quantity—to deliver. But once it is known how many goods the buyer needs (a fact that is parol evidence) the seller can easily determine how many to deliver. This is equally true if the quantity term is "50% of buyer's needs" or "a third of buyer's requirements."

contract in which a buyer promises to buy, and a seller to supply, all the goods or services that a buyer needs during a specified period." *Black's Law Dictionary* (11th ed.), p. 410; *Airboss*, 511 Mich. at 182. In the automotive supply chain, buyers typically use documents called *releases* to communicate to the seller the specific quantities it needs on specific dates. *Airboss*, 511 Mich. at 183.

In Michigan, a requirements contract need not be exclusive. *Id.* at 194. A nonexclusive requirements contract, though, must still "measure[] the quantity by . . . the requirements of the buyer," § 440.2306(1), and "dictate that the buyer will obtain a *set share* of its total need from the seller (such as 'all requirements of the buyer')," *Airboss*, 511 Mich. at 183. This set share must be stated precisely: "A contract may leave the final or total quantity ambiguous or unspecified in a requirements contract, but it may not state an imprecise quantity term." *Id.* at 193.[5]

The Supreme Court thus distinguished between the *quantity term* and the *specific* or *total quantity*, which it explained with this example:

> For example, a produce market owner could agree with Orchard X that "as a blanket policy, I will buy all my apples from Orchard X for $3.00/bushel." While we don't know the specific number or total quantity of bushels that the market owner will purchase, we know that 100% of the apples the market owner purchases will come from Orchard X. How do we know this? Because the market owner stated that they would purchase "all my apples" from Orchard X.

---

[5] Or in the recent words of the Sixth Circuit, interpreting *Airboss*: "The quantity term, on its face and as written, must . . . be clear and precise." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 406 (6th Cir. 2024). And the buyer's commitment to obtain a set share of its needs from the seller must be specified "explicitly and precisely." *Id.*

> Accordingly, "all my apples" constitutes the required quantity term in
> this example.

*Airboss*, 511 Mich. at 192–93.

In this example, "all my apples" is "the required *quantity term*," while the *specific* or *total quantity* won't be defined until the market owner determines how many he or she needs that week (a specific quantity) or for the life of the contract (the total quantity). *Id.* at 193. While the *specific* or *total quantity* in a requirements contract may not be known until after entering the contract, the *quantity term* must be precisely stated as a set share at the start or the contract isn't enforceable for the buyer's requirements. *Id.*

The "set share" is thus the link between the requirements *quantity term* and the *specific* or *total* quantity. Imagine the produce market owner above contracts to buy 70% (the *set share*) of its requirements for apples this year from Orchard X. At the beginning of the year, it doesn't know how many apples it will need in total, but as each week comes, the market owner determines how many apples it needs and orders 70% of them (a *specific quantity*) from Orchard X. At the end of the year, the sum of all the market owner's weekly needs is its total requirements and 70% of that (the *set share*) yields the *total quantity*. A reviewing court could thus easily determine whether each of the parties fully performed by assessing whether the market owner bought and Orchard X delivered that total quantity.

Applying this to the automotive supply chain, a contract that says it is for "all requirements of the buyer" has an enforceable *quantity term*. *Airboss*, 511 Mich. at 183. This is so even though that quantity term lacks the detail needed to know what

the "specific or total quantity" will be—the contract alone can't tell us how many parts the buyer will ultimately need. *Id.* at 181. Over the life of the contract, the buyer will determine how many parts it needs (such as by determining how many cars it will build that week) and issue releases to the seller identifying specific quantities that are needed on specific days. At the end of the contract, a court evaluating the buyer's performance can consider parol evidence about how many parts the buyer ultimately needed (perhaps by counting the total cars built) and compare it to the total quantity ordered from the seller. A court can thus rely on parol evidence to learn what the buyer's ultimate requirements were and then use that to determine whether the buyer ordered what it was required to from the seller, and whether the seller delivered what it was required to. In this way, a contract for "all requirements of the buyer" might ultimately mean "11 parts" or "937,246 parts"—the contract is enforceable for the buyer's requirements even if that total isn't known at the start or stated on the face of the contract. *Id.* at 181–83 & 192–93.

### B. The Michigan Supreme Court also formally recognized release-by-release contracts, which are enforceable only to the extent of the firm quantities stated on the last release accepted by the seller.

Also in *Airboss*, the Michigan Supreme Court formally recognized and named another type of contract structure—the *release-by-release contract*. *Airboss*, 511 Mich. at 184. A release-by-release contract often looks much like a requirements contract, with a purchase order or other contract, incorporated terms, and releases. *Id.* at 183–84. The key difference is that the contract and its incorporated terms "do[] not

— 14 —

set forth the share of the buyer's need to be purchased from the supplier." *Id.* at 184. Because the contract lacks a quantity term, it is not enforceable on its own; instead, enforceable contracts are formed each time the buyer issues and the seller accepts a release. *Id.* at 184–85. Each contract is thus enforceable for only the firm quantity stated in each accepted release. *Id.* This means that the buyer does not have to offer a release to the seller each time it needs goods, and the seller does not have to accept each offered release. *Id.* This all comes down to the "level of mutual obligation":

> *The key difference between a requirements contract and a release-by-release contract rests in the level of mutual obligation between the parties* and the risk each party bears. A requirements contract assures the seller that the buyer will be a customer for the length of the contract, but the seller cannot reject future orders for the length of the contract. In contrast, a release-by-release contract "gives both parties the freedom to allow their contractual obligations to expire in short order by either not issuing or not accepting a new release." . . . The seller cannot be guaranteed future business from the buyer, but the seller can accept or reject any offer for future orders.

*Id.* at 185 (internal citations omitted).

### C.  The contract here is either for one part or is a release-by-release contract; it is not a requirements contract.

This contract is not a requirements contract because it does not contain a quantity term linking DDC's obligation to buy and Martinrea Honsel Mexico's obligation to deliver to DDC's requirements. Instead, DDC's only promises to buy some unspecified quantity between "1 part to 100% of DDC's needs" for the parts. 2024 Amendment § 1.1, ECF No. 14-4, PageID.898; *see also* 2024 Terms § 1, ECF

— 15 —

No. 14-4, PageID.902 ("DDC agrees to purchase from Seller a quantity between a single good and 100% of DDC's needs for the goods").

So what does DDC commit to in this contract? It promises to buy no more than a single part, no matter how many parts it needs. There is no connection between how many parts DDC must buy (1 part) and its requirements, as § 2-306(1) requires for an enforceable requirements contract. § 440.2306(1) ("A term which measures the quantity by . . . the requirements of the buyer"). This is not a requirements contract.

Instead, this is either a contract for a single part or a release-by-release contract for the firm quantities stated on the last accepted release. It shouldn't matter which, because Martinrea Honsel Mexico has met its obligation either way—it has delivered all firm quantities on all accepted releases, which is more than one part. Ex. 1 ¶ 8. Because Martinrea Honsel Mexico has not accepted any further releases from DDC, the contract has expired. *Airboss*, 511 Mich. at 185.

### D.   That this is not a requirements contract is supported by DDC's course of performance.

The conclusion that this is not a requirements contract is supported by DDC's behavior. In her affidavit, DDC's Kristin Browning admits that DDC has a secondary source for the parts and that it normally orders about 70 or 75% of its requirements for the parts from Martinrea Honsel Mexico. Browning Affidavit ¶¶ 8 & 12, ECF No. 14-3, PageID.878 & 880. Where does that 70-to-75% come from? It certainly doesn't appear in the LTA anywhere. So DDC has been buying that portion of its needs from Martinrea Honsel Mexico simply because that's what

DDC chose to do. In other words, the quantity that DDC buys from Martinea Honsel Mexico is determined by DDC's whim, not its requirements.

### E.    This Court should reject DDC's argument to apply the Michigan Court of Appeals' *Cadillac Rubber* opinion because it conflicts with the Michigan Supreme Court's later decision in *Airboss*.

DDC leans heavily on the Michigan Court of Appeals' decision in *Cadillac Rubber*, 331 Mich. App. 416, in support of its argument that this is a requirements contract. But *Cadillac Rubber* conflicts with the Michigan Supreme Court's more-recent decision in *Airboss*, so this Court should follow *Airboss*.

In *Cadillac Rubber*, the Court of Appeals held that a contract that said the buyer had to buy "no less than one piece or unit of each of the Supplies and no more than one hundred percent (100%) of Buyer's requirements" was "indisputably" a requirements contract. *Id.* at 420, 429. That clashes with the Court of Appeals' unpublished decision in *Acemco, Inc. v. Olympic Steel Lafayette, Inc.*, 2005 WL 2820716 (Mich. App.), key parts of which were adopted by the Michigan Supreme Court in *Airboss*.

In *Acemco*, the Court of Appeals defined a requirements contract to be an agreement "in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services from the seller." 2005 WL 2820716, at *8; *see Airboss*, 511 Mich. at 182–83 (adopting this definition). This language—particularly the emphasis on the two promises exchanged—highlights that the level of mutual obligation is key to a requirements contract. In

short, the seller's obligation to deliver must match the buyer's to buy. *Airboss* emphasized this: the "key difference between a requirements contract and a release-by-release contract rests in the level of mutual obligation between the parties and the risk each party bears." *Airboss*, 511 Mich. at 185.

*Cadillac Rubber* clashes with the mutuality described by *Acemco* and adopted by *Airboss*. How many widgets must a buyer purchase under a contract with language like that in *Cadillac Rubber* (and like that here)? At least one. This is true even if the buyer requires 1,000—it can buy up to 1,000 (because it can buy up to all it needs). But it doesn't have to. It has fulfilled its contractual obligation by buying a single widget. Whether it buys any more is entirely within its discretion, and not a matter of its requirements.

Under *Cadillac Rubber*, however, the seller has no similar discretion: the seller had to deliver all the parts that the buyer ordered. Whether measured by the buyer's requirements or otherwise, there is no mutual obligation to buy and sell the same quantity of parts. Put another way, *Cadillac Rubber* effectively permits a different quantity term for the buyer ("at least one") than for the seller ("all that the buyer orders"). Nothing in the UCC contemplates the buyer and seller having different quantity terms in this way. Nothing in *Airboss* supports that, either.

Some of the *Airboss* litigants asked the Michigan Supreme Court to overrule *Cadillac Rubber* while deciding *Airboss*. The Court declined to do so, but only because that step wasn't necessary to decide the *Airboss* case—whether *Cadillac Rubber* conflicts with *Airboss* was expressly left "for another day." *Airboss*, 511 Mich. at 194 n.4.

Here, it is necessary to determine which conflicting ruling governs, and that's an easy determination—the Michigan Supreme Court's more recent opinion in *Airboss* controls over an earlier decision of an inferior court. *In re Flint Water Cases*, 584 F.Supp.3d 383, 397 (E.D. Mich. 2022) ("Because this is a diversity action, the Courts will apply Michigan substantive law as determined by the Michigan Supreme Court as well as federal procedural law."). "If the Michigan Supreme Court has not spoken to a particular issue, [the Courts] must predict how the Michigan Supreme Court would rule if confronted with that issue." *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007). For the reasons explained above, the Michigan Supreme Court would rule that *Airboss* contradicts *Cadillac Rubber* and so reverse *Cadillac Rubber*. Here, that means this Court should reject DDC's argument that this is a requirements contract under *Cadillac Rubber* and hold that it is a release-by-release contract under *Airboss* or a contract for a single part. Either way, Martinrea Honsel Mexico has made all required deliveries and rejected all releases for deliveries after March 7, 2025, so its contractual obligations to DDC have expired. *Airboss*, 511 Mich. at 185.

DDC thus cannot establish that it is likely to succeed on the merits of its claim. For this reason alone, DDC's motion should be denied. *Gonzales*, 225 F.3d at 625 (a lack of a likelihood of success on the merits is "fatal" to a motion for preliminary injunction); *Ultra Mfg.*, 713 F. Supp. 3d at 396 (same).

2.     **In *Ultra Mfg.*, Judge Steeh adopted the analysis above, followed *Airboss* over *Cadillac Rubber*, and denied a substantially identical motion.**

In this District, Judge George Caram Steeh accepted the reasoning above in denying a substantially identical motion for preliminary injunction in *Ultra Mfg.*

*Ultra Mfg.*, like this case, arose from a dispute between automotive suppliers. 713 F. Supp. 3d at 395. The contract at issue provided that "some portion or all of [the buyer's] requirements will be obtained from [the seller]. This is a requirements contract." *Id.* (While this uses different words than the contract here, "some" encompasses any amount but none, so this is a "1 part to 100% requirements" provision.) Unhappy with the pricing, the seller rejected releases and claimed that the contract had expired; the buyer sued and moved for a preliminary injunction, claiming that it would be irreparably harmed if it didn't get more parts from the seller. *Id.* at 395–96.

The dispositive issue in *Ultra Mfg.* was the same as that here: "whether the parties' agreement is a requirements contract, binding [the seller] to continue supplying parts to [the buyer] for the life of the program, or whether it is a 'release-by-release' contract, allowing it to stop selling those parts once it satisfies the final accepted release." *Id.* at 396. The *Ultra Mfg.* Court summarized the *Airboss* opinion before turning to the parties' arguments. *Id.* at 396–97. The Court concluded:

> However, "some portion or all of Purchaser's requirements" is not a sufficient quantity term to satisfy the statute of frauds. "[I]n a requirements contract, the terms of the blanket purchase order also dictate that the buyer will obtain a set share of its total need from the seller (such as 'all requirements of the buyer')." *Airboss*, 511 Mich. at 183, 999 N.W.2d 335 (emphasis added). Here, [the buyer] agreed to

— 20 —

purchase "some portion or all" of its requirements from [the seller], not a "set share of its total need." *Id.* This imprecise quantity term is insufficient under *Airboss.* "A contract may leave the final or total quantity ambiguous or unspecified in a requirements contract, *but it may not state an imprecise quantity term.*" *Id.* at 193, 999 N.W.2d 335 (emphasis added). *In light of the imprecise quantity term, the parties' agreement does not qualify as an enforceable requirements contract.*

*Ultra Mfg.*, 713 F. Supp. 3d at 398.

The buyer argued that the *Ultra Mfg.* Court should follow *Cadillac Rubber*, but the Court disagreed: "The court concludes that *Cadillac Rubber* irreconcilably conflicts with *Airboss* on this point, and it is obligated to follow *Airboss.*" *Id.* (citing *Servo Kinetics*, 475 F.3d at 798 (in a diversity case, the court applies "Michigan law as determined by the Michigan Supreme Court. . . . If the Michigan Supreme Court has not spoken to a particular issue, we must predict how the Michigan Supreme Court would rule if confronted with that issue.")).

The Court thus held:

> Because the parties' agreement is not a requirements contract, [the seller] is free to allow its obligations to expire by not accepting further releases. In other words, [the seller] is not required to continue to supply parts at the original contract price and it is not in breach of the parties' agreement. Therefore, [the buyer] is not likely to succeed on the merits of its contract claim, which is fatal to a request for injunctive relief.

*Ultra Mfg.*, 713 F. Supp. 3d at 398 (internal citations omitted). For the reasons explained above, this Court should reach the same conclusion as Judge Steeh and, for the same reasons, deny DDC's motion.

3.    **DDC's arguments to the contrary should be rejected.**

A.    **DDC's reliance on *Dieomatic* is misplaced.**

In its brief, DDC cites *Dieomatic, Inc. v. Gen. Aluminum Mfg. LLC*, 2023 WL 5804426 (W.D. Mich. 2023), as an example of a court following *Cadillac Rubber* after the Michigan Supreme Court's *Airboss* opinion. *Dieomatic* doesn't support DDC's position. It doesn't cite *Airboss*, and it is clear why. Briefing in *Dieomatic* was completed before the Supreme Court decided *Airboss*,[6] and *Dieomatic* was decided on August 3, 2023, about three weeks after *Airboss*. *Compare Dieomatic*, 2023 WL 5804426 with *Airboss*, 511 Mich. 176. So no party could have made any arguments based on *Airboss*, and there is no evidence that the *Dieomatic* court was aware of the Michigan Supreme Court's three-week-old decision when it issued its opinion. So *Dieomatic* doesn't support following *Cadillac Rubber* after *Airboss*.

B.    **A contract that measures the quantity by the buyer's discretion is not enforceable as a requirements contract.**

DDC cannot argue that it isn't exercising discretion in choosing what share of its needs to order from Martinrea Honsel Mexico and what share from its other supplier. So it may argue that a buyer having discretion about how many goods to buy from a seller isn't inconsistent with a requirements contract. But DDC would be wrong.

Michigan law prohibits any discretion in the quantity term of a requirements contract under UCC § 2-306. This is evident in the plain language of that section,

---

[6] See the *Dieomatic* docket available on PACER (Western District of Michigan Case No. 1:23-cv-00522) (last visited March 11, 2025).

which defines a requirements contract as one that "measures the quantity by . . . the requirements of the buyer." § 440.2306(1). When the buyer has discretion to buy a range of quantities, even once its needs are known, the quantity is no longer measured by the buyer's needs. Instead, it is measured by the buyer's whim. And that is not a requirements contract under § 2-306.

*Airboss* is clear about this when it says that a quantity term must be "precise." "Precise" means "marked by exactness and accuracy of expression or detail." *Oxford Dictionary of English* (2024) (app version). "A contract may leave the final or total quantity ambiguous or unspecified in a requirements contract, but *it may not state an imprecise quantity term*." *Airboss*, 511 Mich. at 193. Or in the words of the Sixth Circuit, "[t]he quantity term, on its face and as written, must therefore be *clear and precise*." *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 406 (6th Cir. 2024) (applying Michigan law,); *see also id.* ("To establish that the parties have a requirements contract, Autoliv must show that its purchase orders *explicitly and precisely* specify that '[Autoliv] will obtain a set share of its total need from [Higuchi].'").

So there is no room for discretion in a requirements contract because there is no room for imprecision—that very discretion divorces the amount the buyer must buy from the amount that it needs in violation of § 2-306.

## CONCLUSION AND RELIEF REQUESTED

For the reasons explained above, DDC is thus unlikely to succeed in providing that Martinrea Honsel Mexico has any contractual obligation to deliver parts.

Martinrea Honsel Mexico thus breaches nothing by not delivering, and DDC has no basis to insist on further deliveries. A movant that is unlikely to succeed on the merits has a fatally flawed motion for preliminary injunction. That is the case here, so this Court should deny DDC's motion.

Respectfully submitted,

BROOKS WILKINS SHARKEY & TURCO

  /s/ Jason D. Killips
Jason D. Killips (P67883)
T.L. Summerville (P63445)
Kevin A. Clark (P83173)
Christopher R. Struble (P83714)
401 S. Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
248.971.1800
killips@bwst-law.com
summerville@bwst-law.com
clark@bwst-law.com
struble@bwst-law.com

*Counsel for Martinrea Honsel Mexico*

— 24 —

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of the filing to all counsel of record.

## LOCAL RULE CERTIFICATION

I certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

   /s/ Jason D. Killips (P67883)
401 S. Old Woodward Avenue, Suite 400
Birmingham, Michigan 48009
248.971.1800 / killips@bwst-law.com

*Counsel for Martinrea Honsel Mexico*